# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLOTTE WONSEWITZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:11CV1307MLM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the applications of Charlotte Wonsewitz ("Plaintiff") for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. Plaintiff filed a Brief in Support of the Complaint. Doc. 13. Defendant filed a Brief in Support of the Answer. Doc. 16. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c)(1). Doc. 7.

## I.
## PROCEDURAL HISTORY

On October 31, 2008, Plaintiff filed an application for disability benefits, alleging an onset date of October 9, 2008. Tr. 134-40. Plaintiff's application was denied and she filed a request for a hearing before an Administrative Law Judge (ALJ). Tr. 86-92. On April 1, 2010, a hearing was held before an ALJ. Tr. 9-61. By decision dated May 21, 2010, the ALJ found Plaintiff not disabled through the date of the decision. Tr. 65-83. The Appeals Council denied Plaintiff's request for review on June 18, 20100. Tr. 1-6. As such, the decision of the ALJ stands as the final decision of the Commissioner.

# II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008)

("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC.").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

### III.
### DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is

substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff, who was forty-nine years old at the time of the hearing before the ALJ, testified that she had a twelfth grade education; that she was 5'4" tall and weighed 166 pounds; that she was married and her husband worked; that she previously worked as a house cleaner, food demonstrator, and food delivery person prior to her becoming disabled; and that she had disc disease, fibromyalgia, problems with her shoulders, and memory problems. Tr.166-67.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date; that Plaintiff was not fully credible; that she had the severe impairments of status post right rotator cuff repair, disorders of the cervical and lumbar spine, obstructive lung disease, depressive disorder not otherwise specified, and a learning disorder not otherwise specified; that Plaintiff did not have an impairment of combination of impairments that met or medically equal a listed impairment; that Plaintiff had the RFC for light work with certain limitations; that Plaintiff was unable to perform her past relevant work; that, based on the testimony of a VE, there was work which Plaintiff could perform; and that, therefore, Plaintiff was not disabled within the meaning of the Act.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ's RFC determination is conclusory and not based on substantial evidence; because the ALJ failed to specify the evidence upon which he relied when reaching his RFC determination; because the ALJ did not address all the evidence when reaching his RFC determination; because the ALJ did nothing more than recognize that Plaintiff had a severe learning disorder; because the ALJ failed to follow the regulations when evaluating Plaintiff's mental impairments and resulting functional limitations;

because the ALJ did not discuss findings related to a Global Assessment of Functioning (GAF) score assigned to Plaintiff; because the ALJ did not account for Plaintiff's "markedly decreased range of motion in both shoulders" in his RFC determination; because the ALJ did not account for the severity of Plaintiff's cervical and lumbar spine impairments upon determining her RFC; because it is not clear if the ALJ considered findings of Inna Park, M.D., in regard to Plaintiff's diminished upper and lower extremity strength; because the ALJ did not discuss Plaintiff's obstructive lung disease; and because the ALJ failed to explain how he considered the findings of a February 2010 consultive examination.

## A.    Plaintiff's Credibility:

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including Plaintiff's RFC. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. Guilliams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately

explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that Plaintiff failed to seek ongoing medical treatment for her alleged "emotional/mental disability" and that her "failure to seek treatment tend[ed] to suggest either no or tolerable [symptoms]." Tr. 76. See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)); Comstock v. Chater, 91 F.3d 1143, 1146-46 (8th Cir. 1996) (citing Benskin, 830 F.2d at 884); Polaski, 739 F.2d at 1322. In this regard, the record establishes that Plaintiff did not seek any treatment from a mental health specialist during the relevant period. In fact, during a consultive psychological evaluation in March 2009, Plaintiff reported to Thomas J. Spencer, Psy.D., that she had never been to a psychiatrist or a psychologist. Tr. 73, 76, 402. As such, the court finds that the ALJ's considering Plaintiff's failure to seek ongoing medical treatment for her alleged mental disability is based on substantial evidence and is consistent with the regulations and case law.

Second, the ALJ considered Plaintiff's lack of compliance with prescribed treatment.  In particular, Plaintiff reported during her March 2009 psychological evaluation that, although she had been prescribed antidepressant medication, she did not take it. Tr. 402.  Also, Plaintiff testified that despite her being told to stop smoking, she continued to do so. Tr. 37.  Additionally, Sergio G. Garcia, M.D., reported on June 19, 2008, that Plaintiff had a twenty-year "history of tobacco abuse"; that he was prescribing Chantix; and that, "[h]opefully, [Plaintiff] [would] be able to quit." Tr. 325. Plaintiff's physical therapist reported that when it was recommended that she wear a sling to support her shoulder after rotator cuff surgery, Plaintiff did not do so. Tr. 354.  Physical therapy records reflect that Plaintiff cancelled her October 29, 2008 post-rotator cuff surgery physical therapy appointment, stating that she had a dentist appointment.  On October 31, 2008, Plaintiff cancelled her physical therapy appointment for that date. Tr. 359.  On November 3, 2008, Plaintiff left a message stating that she was unable to attend therapy because of the cost. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a plaintiff's argument that he was unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents).  The therapist reported, however, that she spoke to her boss about this; that the boss contacted Plaintiff about treatment; and that messages were "let for [Plaintiff] to contact [the physical therapists] to work something out." Tr. 359. When Plaintiff returned to physical therapy on November 6, 2008, the therapist explained to Plaintiff "the importance of attending therapy in order to progress through her home exercise program and increase range of motion." Tr. 363.  Physical therapy notes from November 10, 12, and 14, 2008, reflect that Plaintiff said she had "been performing her home exercise program minimally secondary to low back pain." Tr. 367, 369, 371.  Physical therapy notes of November 17, 2008, state that Plaintiff had been performing the pulley at home "but ha[d] not been doing much of the other

exercises." Tr. 373. Plaintiff cancelled her November 24, 2008 physical therapy appointment. Tr. 378. Finally, Plaintiff was discharged from physical therapy on January 14, 2009. Notes of that date reflect that Plaintiff had not been seen since November 17, 2008, and that "[s]he was contacted to continue therapy, but did not return [the therapist's] messages." Tr. 382. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments and that no physician imposed any work-related restrictions on her) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain). As such, the court finds that the ALJ's consideration of Plaintiff's lack of compliance is based on substantial evidence and is consistent with the regulations and case law.

Third, the ALJ considered Plaintiff's daily activities and considered that, while not entirely dispositive, they "tend[ed] to suggest a residual capacity at odds with a finding of disability." Tr. 76. Plaintiff reported that she cared for a family pet, prepared meals, performed household dusting, drove a car, shopped in stores, and managed money. Tr. 76, 174, 177-78, 181. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001)

(citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [her] activities diminish [her] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen, 75 F.3d at 439-41 (holding that a claimant's daily activities, including visiting neighbors, cooking, doing laundry, and attending church, were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit her complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Fourth, the ALJ considered that subsequent to Plaintiff's October 9, 2008 rotator cuff surgery, it was reported that there was interval healing; that Plaintiff was "doing quite well," with "good wound healing" and a "good early range of motion." Tr. 71. Also, on November 20, 2007, when Plaintiff said that she had trouble sleeping due to pain, she also reported that she was able to sleep through the night with Clonazepam. Tr. 241-42. When Plaintiff underwent physical therapy after rotator cuff surgery, her therapist reported, on October 24, 2008, that Plaintiff's range of motion was improving and that she should continue her rehabilitation program. Tr. 354-55. Plaintiff's physical therapist reported, on October 27, 2008, that Plaintiff had "progressed with conservative active assistance flexion in supine" and that she should continue physical therapy. Tr. 356-57. Plaintiff reported, on December 18, 2008, when seen at the office of Timothy G. Graven, D.O., that her pain got "better only with medication." Tr. 340. After undergoing physical therapy, Plaintiff told her therapist, on November 26, 2008, that she wanted "to stop formal physical therapy." Tr. 381. Plaintiff told Mary Fox, M.D., of the Headache and Chronic Pain Management Department at the St. Louis Behavioral Medicine Institute, on February 11, 2010, that trigger point injections in the shoulders were "of some benefit." Tr. 491. After examining Plaintiff, Dr. Fox opined that "there may

not be an 'answer' to [Plaintiff's] pain syndrome but that there [were] multiple modalities and treatment options available." Dr. Fox also reported on this date that Plaintiff should see Dr. Herman Witte for cognitive behavior therapy and that Plaintiff might need "some post-traumatic stress disorder treatment." Tr. 495. Conditions which can be controlled by treatment are not disabling. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). The court finds that the ALJ's decision, in this regard, is based on substantial evidence and that it is consistent with the regulations and case law.

Fifth, the ALJ considered the results of objective testing. In particular, the ALJ considered that there was a "relative lack of more clinically significant findings on examinations and diagnostic work-up." Tr. 76. See Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (citing Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir.2008)); Pelkey v. Barnhark, 433 F.3d 575, 578 (8th Cir. 2006) (holding that the absence of objective medical basis for a claimant's complaints is one factor to be considered upon determining claimant's credibility); Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004). In this regard, an electromyographic and nerve conduction study (EMG-NCS) study of Plaintiff's lower extremities, preformed on November 20, 2007, was normal and showed "no evidence of neuropathy, myopathy, or radiculopathy in the areas examined." Tr. 243. A December 6, 2007 MRI of the lumbar spine showed "normal alignment of the lumbar vertebral bodies," degenerative disc disease from L2 to L5 with "varying degrees of mild disc space narrowing and disc bulging," and

no disc herniation or stenosis at any level. Tr. 244. A February 1, 2008 CT of Plaintiff's abdomen and pelvis showed that Plaintiff's "lower lung fields [were] free of acute infiltrate"; that the CT of Plaintiff's upper abdomen was negative; that the CT of Plaintiff's pelvis showed a "[s]mall left ovarian cyst"; and that the CT of the pelvis was "otherwise negative." Tr. 285. A May 21, 2008 scan of Plaintiff's chest showed that the heart appeared unremarkable and that, compared to a January 2007 scan, there was no significant change with no active disease. Tr. 264. A June 4, 2008 ultrasound of Plaintiff's pelvis showed that Plaintiff had a "simple cyst in the left ovary" and that the complex cyst previously seen within the right ovary had resolved. Tr. 283. Sergio G. Garcia, M.D., reported on June 19, 2008, that pulmonary nodules were seen on a June 4, 2008 CT exam and that the "most reasonable thing to do with these nodules considering they [were] so small would be to repeat the CT ... in about 6 months." Tr. 324. Dr. Garcia reported that Pulmonary Function Testing of November 12, 2008, showed that spirometry showed an FVC of 91% of predicted, FEV1 of 69% of predicted, FEV1/FVC of 63% of predicted, FEF25-75 of 53% of predicted, and no significant change post-bronchodilator.[1] Dr. Garcia reported that the test results showed "[m]ild to moderate obstructive lung disease without any significant acute response to bronchodilators"; that there was "no evidence of hyperinflation"; that there was "mild air trapping"; that there was "mild increase in airway resistance"; and that "diffusing testing was normal once corrected for alveolar volume." Tr. 322. A report from a CT of Plaintiff's thorax, performed on November 12, 2008, states that Plaintiff had

---

[1]    The Regulations state that "once a [respiratory] disease process is established by appropriate clinical and laboratory findings," "pulmonary function testing is required to assess the severity of the respiratory impairment." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.00(A) (2000). The critical spirometric value for assessing disability based on COPD is the $FEV_1$ value, or forced expiratory volume at one second. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.02(A) (2000). The Regulations stipulate that any pulmonary function test resulting in an $FEV_1$ value less than 70 percent of the predicted value must be repeated after administration of an aerosolized bronchodilator to the test subject. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.00(E).

"[o]ld granulomatous disease with several scattered calcified granulomas within each lung" and that additional chest scans to be taken in June 2009 and 2010 would "suffice for surveillance." Tr. 328-29. A February 17, 2008 pelvic x-ray report stated that Plaintiff had "no osseous abnormalities" and that the x-ray was "normal." Tr. 471.

An MRI performed on February 27, 2009, showed "mild degenerative disc disease with disc space narrowing" at C5-C6 and C6-C7; that C2-C3 and C3-C4 were normal; and that there was "very minor bulging at C4-C5," "moderate cervical spondylosis ... with reversed lordosis," asymmetric disc osteophyte complex at several levels, and no evidence of acute vertebral body fractures. Tr. 399. An October 26, 2009 x-ray of Plaintiff's lungs showed "mild hyperinflation of the lung field," no acute infiltrate, "some calcified granulomas, and "[n]o active disease in the chest." Tr. 481. Todd Neuberger, M.D., reported that an October 28, 2009 Arterial Doppler Examination of Plaintiff's lower extremities showed "no evidence of arterial insufficiency in the lower extremities" both at rest and after a "nonstandard exercise test." Tr. 482-83. Lewis Halverson, M.D., reported that an August 28, 2009 x-ray of Plaintiff's pelvis after "[s]everal recent falls" showed no evidence of fracture and that the sacroiliac joints were intact. Tr. 480. The court finds that the ALJ's consideration of objective test results is based on substantial evidence and consistent with the regulations and case law.

Sixth, the ALJ considered that doctors' records did not support Plaintiff's claims regarding the severity of her conditions. Tr. 76. "[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inconsistencies or other circumstances." Eichelberger, 290 F.3d at 589. See also Pelkey, 433 F.3d at 578. The court has set forth objective test results above. Additionally, Martin Walsh. M.D., examined Plaintiff on September 4, 2008, and reported that Plaintiff "appear[ed] well" and was in "no apparent distress"; that her physical exam was "generally normal"; that her lungs were

"clear to auscultation"; that Plaintiff's neurological exam was "normal without focal findings"; that Plaintiff's "ENT [was] normal, neck supple, and free of adenopathy, or masses"; that her cranial nerves and fundi were normal; and that Plaintiff's "[e]xtremities, peripheral pulses and reflexes [were] normal." Tr. 261. Fallon Maylock, M.D., saw Plaintiff on September 25, 2008, and reported that Plaintiff presented with pain and weakness in the right shoulder and that, upon examination, Plaintiff did have "bilateral sciatica, pain, and marked decreased range of motion of the shoulders, right worse than the left." Tr. 387. On September 26, 2008, Dr. Maylock noted that rotator cuff repair would be scheduled for Plaintiff. Tr. 387. Dr. Maylock performed rotator cuff surgery on Plaintiff on October 10, 2008. Tr. 393. As stated above, ten days later, it was reported that Plaintiff was doing well. Tr. 386.

As discussed above, Plaintiff commenced physical therapy on October 22, 2008, and was discharged in January 2009. Medical records of December 18, 2008, reflect that Plaintiff's respirations were "even and unlabored"; that Plaintiff's low back was nontender to palpation; that Plaintiff's light touch sensation was "intact"; that she walked "somewhat forward flexed with a very slow and exaggerated gait"; that "bilateral straight leg raises [were] positive for back pain"; that Plaintiff was "able to heel toe walk without difficulty"; that Plaintiff's lower extremity strength was "5/5 and equal"; and that physical therapy was recommended. Tr. 340-41. When Plaintiff presented to Martin J. Walsh, M.D., on February 17, 2009, Dr. Walsh reported that Plaintiff said she could not walk because her legs hurt. On examination, however, Dr. Walsh reported, in regard to Plaintiff's hips, that Plaintiff was normal bilaterally; that she had no pain on motion, no effusion, tenderness, masses, or contracture or deformity. Upon examination of Plaintiff's lumbosacral spine area, Dr. Walsh reported that there was no local tenderness or mass and that Plaintiff had full and painless lumbosacral range of motion. Dr. Walsh also reported that Plaintiff's "straight leg raise [was]

negative at 90 degrees on both sides; that "DTR's, motor strength, and sensation [were] normal, including heel and toe gait"; that peripheral pulses [were] palpable"; that Plaintiff's hips and kneed had "full range of motion without pain"; and that there was no abdominal tenderness. Tr. 456. Inna Park, M.D., reported on April 22, 2009, that Plaintiff was 66 inches tall and weighed 200 pounds; that she was obese; that Plaintiff had "normal endurance" during the examination; that Plaintiff had normal speech, hearing, and affect; that Plaintiff's lungs were clear, without wheezes, rhonchi, or rales; that despite Plaintiff's "point[ing] out swelling behind the knees and [] ankles ... no abnormalities [were] noted"; that there was "[n]o palpable tenderness of the cervical, thoracic or lumbar spine"; that Plaintiff had "[n]o muscular tenderness or spasm"; that she had no joint inflammation or muscular atrophy; that Plaintiff was able to sit from a lying position without difficulty; that Plaintiff's had symmetric and normal motor strength bilaterally; that she had "[n]o abnormal reflexes"; that there was a cane in the room which Plaintiff did not use during the exam; that Plaintiff had a "slow and shuffling gait with no obvious antalgic elements"; and that Plaintiff had normal muscle tone, normal fine motor control, and a normal sensory exam. Tr. 426- 27. When Plaintiff presented on August 30, 2009, complaining of pain in both legs and shoulders, Dr. Walsh reported that a "general joint exam [was] normal with full range of motion of spine, elbows, wrists, fingers, hips, knees and ankles" and that there was "no active swelling, tenderness or synovitis at any joint." Dr. Walsh noted "? Fibromyalgia syndrome" and said that Plaintiff should be referred to rheumatology. Tr. 454-55. On December 2, 2009, Dr. Walsh noted that Plaintiff had been seen by rheumatology; that she was told that she had degenerative joint disease; that she was referred to a pain clinic; that Plaintiff "appear[ed] well" and was in "no apparent distress"; and that her "[l]ungs were clear to auscultation." Tr. 451.

In a letter dated February 11, 2010, Dr. Fox reported to Dr. Walsh, that Dr. Fox evaluated Plaintiff regarding her complaints of pain and that physical examination showed that Plaintiff's lungs were clear; that her heart was without murmur, gallop, or click; that her abdomen was nontender with no masses; that, in regard to Plaintiff's extremities, she had "1+/4+ peripheral pulses," "essentially intact" capillary refill, no synovitis, mild to moderate degenerative changes in hand joints, and no edema; and that, in regard to her muscles, Plaintiff had "[t]enderness in the upper back and along the paraspinous muscles, upper and lower," and "no other muscle group tenderness." Dr. Fox further reported that a neurologic exam showed that Plaintiff's cranial nerves were intact; that rapid alternating movements were intact in the upper extremities; that deep tendon reflexes were intact and symmetrical in the lower extremities; that Plaintiff had difficulty with tandem gait and could not "do a heel gait or a toe gait well"; the Plaintiff had "somewhat of a shuffling gait; that when a Romberg was performed, Plaintiff had "some sway although she [was] able to keep her balance with light tapping"; and that "some mild proprioceptive difficulties [were] noted." Tr. 494-95. The court finds that the ALJ's finding that doctors' records did not support Plaintiff's claims regarding the severity of her conditions is based on substantial evidence and that it is consistent with the regulations and case law.

Seventh, the ALJ considered that Inna Park, M.D., observed, when Plaintiff presented for a consultive physical examination, on April 22, 2009, that Plaintiff was "physically resistant and showed poor effort during the evaluation process." Tr. 72. Additionally, when Plaintiff presented to St. Peters Bone & Joint Surgery on December 18, 2008, and complained of pain, it was reported that Plaintiff was a "particularly difficult historian secondary to reluctance to answer the examiner's questions with straightforward answers." Tr. 340. Certainly, when an examining physician express doubts about the validity of a claimant's complaints, this is a factor which discounts the claimant's

credibility. See Baker v. Barnhart, 457 F.3d 882, 892-93 (8th Cir. 2006) (holding that the ALJ properly discounted the claimant's complaints of pain upon considering reports that the claimant exaggerated his symptoms during an examination) (citing Clay v. Barnhart, 417 F.3d 922, 930 n. 2 (8th Cir. 2005) (noting that two psychologists' findings that the claimant was "malingering" on her IQ tests cast suspicion on the claimant's motivations and credibility); Jones v. Callahan, 122 F.3d 1148, 1151-52 (8th Cir. 1997) (holding that a physician's observation "of the discrepancies in [the claimant's] appearance in the examining room and those outside when he did not know that he was observed" supported an ALJ's finding that the claimant's complaints were not fully credible). See also Russell v. Sec'y of Health, Ed. & Welfare, 540 F.2d 353, 357 (8th Cir. 1976) (holding that where doctors reported that the claimant was exaggerating her ailments and was uncooperative, the record did not establish the requisite degree of certainty that the claimant was disabled). The court finds that the ALJ's decision, in this regard, is based on substantial evidence, and that it is consistent with the regulations and case law.

In conclusion, the court finds that the ALJ's credibility determination is based on substantial evidence.

**B.    Plaintiff's Alleged Emotional/Mental Conditions:**

20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. A special procedure must be followed at each level of

administrative review.  See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam).  The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520a.  This Regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. § 404.1520a(a).  However, other considerations are included.  The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists.  20 C.F.R. § 404.1520a(b)(1).  These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. §§ 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. 20 C.F.R.§ 404.1520a(b)(1).  The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. § 404.1520a(c)(2).  Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme."  20 C.F.R. § 404.1520a(c)(4).  The degree of limitation in regard to episodes of decompensation  is determined by application of a four-point scale: "[n]one, one or two, three, four or more."  Id.  When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).  When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are

equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

Despite Plaintiff's assertion to the contrary, prior to evaluating Plaintiff's alleged mental impairment, the ALJ did consider the medical evidence of record as discussed above and below. Also, despite Plaintiff's assertion to the contrary, the ALJ then considered the requirements of the regulations applicable to an alleged mental impairment and found that, in activities of daily living, Plaintiff had a mild restriction; that, in social functioning, she had moderate difficulties; that, in regard to concentration, persistence, or pace, she had moderate difficulties; and that she experienced no episodes of decompensation. Tr. 74. The ALJ concluded that, because Plaintiff did not have at least two "marked" limitations or one "marked" limitation and repeated episodes of decompensation, the "paragraph B" criteria were not satisfied. The ALJ also found that the evidence failed to establish the presence of "paragraph C" criteria. The ALJ then noted that, when determining Plaintiff's RFC, he incorporated her mental limitations to the extent he found them credible. Tr. 75.          In regard to Plaintiff's alleged mental impairments, the ALJ considered, as discussed above, that she did not have regular treatment from a mental health professional. The ALJ also considered that, pursuant to a February 2010 referral, Dr. Fox, of the Headache and Chronic Pain Management Department of St. Louis Behavioral Medicine Institute, reported that Plaintiff was "often tearful during the evaluation process" and that she was "tangential in her interactions." The ALJ noted, however, that Dr. Fox did not "reference to findings for psychomotor agitation or retardation; impaired speech, psychosis; or deficits of cognitive functioning." Tr. 73. A doctor's opinion should not be given

controlling weight when it is not based on sufficient medical data. <u>Leckenby v. Astrue</u>, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation). The ALJ further considered that, upon including significant memory loss, depression, and probable posttraumatic stress disorder, Dr. Fox relied on Plaintiffs "reporting of history." Tr. 73. <u>See</u> <u>Kirby v. Astrue</u>, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence) (citing <u>Vandenboom v. Barnhart</u>, 421 F.3d 745, 749 (8th Cir. 2005)). Significantly, when Dr. Fox opined, in regard to Plaintiff's having memory loss, depression, and probable posttraumatic stress disorder, it was the first time she had seen Plaintiff. When deciding how much weight to give a physician's opinion, an ALJ should consider the length of the treatment relationship. <u>Martise v. Astrue</u>, 641 F3d 909, 926 (8th Cir. 2010) (quoting <u>Casey v. Astrue</u>, 503 F.3d 687, 692 (8th Cir. 2007)). Moreover, to the extent Dr. Fox diagnosed Plaintiff with mental conditions, the record reflects that she saw Plaintiff pursuant to a consultation for her pain and not for her mental condition. <u>See</u> <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than the opinion of a source who is not a specialist."). <u>See also</u> 20 C.F.R. §§ 404.1527(d)(5), and 416.927(d)(5).

As considered by the ALJ, Dr. Spencer, of Associated Behavioral Consultants, conducted a psychological evaluation of Plaintiff on March 20, 2009, and reported that Plaintiff denied the presence of depression, suicide, or history of any gestures or attempts and that she "endorse[d]

typical symptoms of depression to include low energy and motivation." The ALJ further considered

Dr. Spencer's findings pursuant to a mental status examination. In this regard, Dr. Spencer reported

that Plaintiff had no noticeable impairment in grooming or hygiene; that her eye contact was fair; that

her speech was flat; that her insight and judgment "appeared fairly intact"; that she presented "mildly

dysphoric and tearful"; that she was oriented to person, place, time and event; that her "flow of

thought was intact and relevant"; that, based on her vocabulary, grammar, and general fund of

knowledge, Plaintiff "appeared to be of low average intelligence"; that she was able to complete

"serial 3s"; that "no receptive or expressive language deficit [was] observed"; that "there did not

appear to be impairment in long-term memory"; that she could not discuss current events; that she

could spell the word "world" forward and backwards; that she was able to complete simple

arithmetic; that it was possible that Plaintiff's pain could be psychological in nature; that, based on

the available information, Plaintiff had the ability to understand and remember simple to moderately

complex instructions and to engage in and persist with simple to moderately complex tasks; that

Plaintiff demonstrated mild to moderate impairment in her ability to interact socially and adapt to

routine change in the workplace; and that Plaintiff "did not appear to need assistance in managing her

benefits." Tr. 403-404. Dr. Spencer further opined that Plaintiff had "depressive disorder NOS,"[2]

"learning disorder NOS," "R/O Major Depressive order" and "R/O Somatization disorder." He

further opined that Plaintiff had a global assessment of functioning (GAF) of 50-55.[3] As considered

---

[2]     NOS is medical records most commonly means "not otherwise specified."

[3]     Global assessment of functioning (GAF) is the clinician's judgment of the
individual's overall level of functioning, not including impairments due to physical or
environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV,
30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional
impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or
communication or major impairment in several areas, such as work or school, family relations,
judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent

by the ALJ,[4] a GAF score of 50 to 55 places Plaintiff in the moderate to borderline range. Tr. 74. Indeed, a GAF score of 50 suggests a serious impairment. However, a GAF score may be helpful in assisting an ALJ's formulating a determination, but it "is not essential to the RFC's accuracy." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002). Moreover, the regulations note that the GAF scale "does not have a direct correlation to the severity requirements in [the] mental disorders listings." 65 Fed. Reg. 5046, 50764-65, 2000 WL 1173632 (Aug. 21, 2000).

David Hill, Ph.D., reviewed Plaintiff's medical records and completed a Psychiatric Review Technique Form, in which he opined, consistent with Dr. Spencer's findings, that Plaintiff had a learning disorder, NOS, and depressive disorder, NOS. Tr. 417. While Dr. Hill did not examine Plaintiff, he reviewed Plaintiff's medical records. SSR 96-6p, 1996 WL 374180, provides that findings of State agency psychological consultants regarding the nature and severity of a claimant's impairments must be treated as expert opinion evidence of nonexamining sources by an ALJ. Moreover, state agency medical consultants are highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence. See 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

The ALJ concluded that Plaintiff had a learning disorder, NOS. To the extent Plaintiff contends that the ALJ's decision, in this regard, is not based on substantial evidence because the ALJ

_____

"moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32. See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] ... reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships.' " (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000)) (alterations in original).

[4]    Plaintiff incorrectly states that the ALJ did not consider Dr. Spencer's GAF assessment as he specifically did so. Tr. 74.

did not state the basis upon which he made this determination, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted ... [and][a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.") (internal citations omitted); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Moreover, an ALJ's arguable deficiency in opinion-writing technique does not require his decision to be se aside where the ALJ's ultimate findings are supported by substantial evidence. Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (citing Carlson v. Chater, 74 F.3d 869 (8th Cir. 1996)). In any case, the ALJ determination regarding Plaintiff's having a learning disorder, NOS, is consistent with the findings of both Dr. Spencer and Dr. Hill. In conclusion, the court finds that the ALJ's consideration of Plaintiff's alleged mental impairment is based on substantial evidence and consistent with the regulations and case law.

The regulations define RFC as "what [the claimant] can do" despite her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). In the matter under consideration, upon determining Plaintiff's RFC, the ALJ considered Plaintiff's learning disability. Consistent with Dr. Spencer's findings and those of Dr. Hill, the ALJ found that Plaintiff could understand, remember, and carry out at least simple instructions and non-detailed tasks, adapt to routine/simple work changes, and perform repetitive work according to set procedures, sequence, or space. The court finds, to the extent the ALJ included limitations relevant to Plaintiff's alleged learning/mental impairments in her RFC, that the ALJ's decision is supported by substantial evidence.

C.      **Plaintiff's RFC:**

The ALJ determined that Plaintiff had the RFC for light work except that she can only

occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl; that she is unable to climb ropes,

ladders, and scaffolding; that she is limited in her ability to frequently reach overhead with her right

arm; that she must avoid concentrated exposure to extreme cold and wetness; that she is able to

understand, remember, and carry out at least simple instructions, and non-detailed tasks; that she is

able to adapt to routine/simple work changes; and that she can perform repetitive work according to

set procedures, sequence, or pace.

The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 404.1567(b). Additionally,

"[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the

full range of light work requires standing or walking, off and on, for a total of approximately 6 hours

of an 8-hour workday." SSR 83-10, 1983 WL 31251,*6.

"The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record,

'including the medical records, observations of treating physicians and others, and an individual's own

description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting

McKinney, 228 F.3d at 863). See also Anderson v. Shalala, 51 F.3d. 777, 779 (8th Cir. 1995). To

determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of

the claimant's impairments to determining the kind of work the claimant can still do despite his or her

impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a

"'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting

Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d

at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per

curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

First, upon determining Plaintiff's RFC, the ALJ in this matter considered Plaintiff's credibility, as discussed above, and found her not fully credible. See Tucker, 363 F.3d at 783; Anderson, 51 F.3d. at 779. The ALJ only included Plaintiff's credible limitations in her RFC. See Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."). Second, the ALJ considered Plaintiff's medical records and the opinions of medical professionals and incorporated in her RFC those limitations which he found to be consistent with Plaintiff's medical records.[5] See Lauer, 245 F.3d at 704. As discussed above in regard to Plaintiff's credibility, the ALJ considered that Plaintiff did well after rotator cuff surgery. The ALJ accommodated Plaintiff's arm and shoulder pain as her assigned RFC limits the frequency with which she can reach overhead. The ALJ accommodated Plaintiff's back and lower extremity pain in that he limited her to only occasionally climbing, stooping, kneeling, crouching, and crawling. In regard to Plaintiff's back and lower extremity pain, test results in November 2007 showed Plaintiff's lower

---

[5]      Plaintiff incorrectly states that the ALJ failed to provide a narrative regarding Plaintiff's medical record. In fact, the ALJ provided an extensive and detailed discussion of Plaintiff's medical records, including objective test results, examination results, and the opinions of doctors.

extremities were normal; in September 2008, Plaintiff's physical exam was "generally normal" and her extremities were normal; a December 2007 MRI of her spine showed normal alignment of vertebral bodies with mild disc space narrowing; in February 2008, it was reported that Plaintiff had no local tenderness in the lumbosacral spine area, had full range of motion in this area, and had full range of motion without pain in the hips and knees; in April 2009, Plaintiff had normal endurance, no muscular or palpable tenderness to the spine, no joint inflammation, normal motor strength bilaterally, normal muscle tone, full range of motion of the spine elbows, wrists, fingers, hips, knees, and ankles; in October 2009, there was no evidence of arterial insufficiency in Plaintiff's lower extremities; there was no evidence of fracture in August 2009; and, in February 2009, Plaintiff had only mild to moderate degenerative changes in the hand joints, tenderness in the upper back, no other muscle group tenderness, and intact rapid alternating movements in the upper extremities. Tr. 243-44, 261, 454-55, 480, 482-83, 494.

The ALJ accommodated Plaintiff's difficulty breathing as her RFC limits her exposure to extremes in temperature. In this regard, in June 2008, a CT showed only small nodules which did not warrant treatment at that time; November 2008 testing showed only mild to moderate lung disease; no active disease was seen on October 2009 x-rays; April 2009 examination showed Plaintiff's lungs were clear, without wheezes; and, in December 2009 and February 2010, her lungs were clear. Tr.322, 324, 426-27, 451, 481, 494095. Indeed, Dr. Perll, a state medical consultant reviewed Plaintiff's medical records and opined regarding Plaintiff's limitations. Tr. 433-34. These limitations are consistent with the ALJ's RFC determination. In fact, the ALJ's RFC determination is more restricted than that suggested by Dr. Perll. As stated above, state agency medical consultants are highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence. See 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). As discussed

above, the ALJ considered the findings of mental health professionals regarding Plaintiff's mental conditions and incorporated these limitations in her RFC. Additionally, after ascertaining the extent of Plaintiff's physical impairments, the ALJ determined what Plaintiff could do despite her limitations; the ALJ then incorporated these physical limitations in Plaintiff's RFC. See Lauer, 245 F.3d at 704. The court finds that the ALJ's assessment of Plaintiff's RFC is based upon and is consistent with all of the relevant evidence. See McKinney, 228 F.3d at 863 ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.") (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). As such, the court finds that all arguments of Plaintiff to the contrary are without merit, including her arguments that Plaintiff did not consider certain medical evidence and that the ALJ did not account for alleged limitations in her shoulders, back, and arms, or her alleged mental limitations. Moreover, the ALJ's determination of Plaintiff's RFC is consistent with the regulations and case law.

To the extent Plaintiff argues that the ALJ did not consider the February 11, 2010 findings of Dr. Fox, as stated above, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). Moreover, in the matter under consideration, the ALJ's failure to specifically address Dr. Fox's letter does not require reversal because the record supports the ALJ's overall conclusion. See Karlix, 457 F.3d at 746 (citing Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003)).

To the extent that ALJ's RFC determination is ambiguous regarding the extent to which Plaintiff can lift overhead with her right arm, the court notes that the ALJ posed two hypotheticals

to the VE, one with occasional lifting overhead and one with frequent overhead lifting. The VE testified that whichever was applicable, it did not make a material difference in Plaintiff's ability to perform work available in the national economy. Tr. 58-58. As such, any deficiency in the ALJ's decision, in this regard, does not require reversal because it does not affect the outcome of Plaintiff's case. See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008); Karlix, 457 F.3d at 746; Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."). To the extent the ALJ may not have addressed the requirements of light work, upon finding that Plaintiff can perform such work, he did state that Plaintiff could perform light work as defined by the regulations. Tr. 75. Moreover, as discussed above, Plaintiff's medical records support a finding that she can perform light work. Significantly, Dr. Perll addressed the requirements of light work in his RFC Assessment and found that Plaintiff could perform these requirements with certain restrictions. At most, the ALJ's failure to address the requirements of light work is harmless error as it does not affect the outcome of Plaintiff's case. See Hepp, 511 F.3d at 806; Karlix, 457 F.3d at 746; Senne, 198 F.3d at 1067.

After determining Plaintiff's RFC, based on the testimony of a VE, the ALJ found that Plaintiff could not perform her past relevant work, but that, considering Plaintiff's age, education, work experience, and RFC, there was other work which existed in substantial numbers in the national economy which Plaintiff could perform. Tr. 57-60,77. An ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Martise, 641 F.3d at 927 ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.") (quoting Lacroix, 465 F.3d at 889); Guilliams, 393 F.3d at 804 (holding that a proper hypothetical sets forth

impairments supported by substantial evidence and accepted as true by the ALJ); Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania, 879 F.2d at 445; Rautio, 862 F.2d at180. The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question precisely sets forth all of a claimant's physical and mental impairments, a VE's testimony constitutes substantial evidence supporting the ALJ's decision. Martise, 641 F.3d at 927 ("Based on our previous conclusion ... that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix, 465 F.3d at 889; Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). As the court has found that the ALJ's RFC determination is based on substantial evidence and as the ALJ posed a hypothetical to the VE which included this RFC, the court finds that the ALJ properly relied on the testimony of the VE that there was work which Plaintiff could perform and that the ALJ's decision, in this regard, is based on substantial evidence. As such, the ALJ's determination that Plaintiff is not disabled is based on substantial evidence and consistent with the regulations and case law. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint is **DENIED**; Docs. 1, 13.

**IT IS FURTHER ORDERED** that a separate Judgment, incorporating this Memorandum Opinion, shall be entered in favor of Defendant and against Plaintiff.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of August, 2012.